[S. F. No. 18759. In Bank. May 27, 1954.]

LIONEL L. RIAVE, Petitioner, v. THE COMMITTEE OF BAR EXAMINERS et al., Respondents.

Morse Erskine for Petitioner.

Jerold E. Weil, Morrison, Hohfeld, Foerster, Shuman & Clark and Richard J. Archer for Respondents.

THE COURT.—A resolution of the Committee of Bar Examiners denying Lionel L. Riave's application, made under section 6060.8 of the Business and Professions Code, for admission to practice law without examination, declares that he has not complied with all of the statutory requirements. The record upon which the committee acted is before this court upon Riave's petition to review its determination. (Rules on Original Proceedings in Reviewing Courts, rule 59[b].)

Section 6060.8 excuses the requirement of a final bar examination (Bus. & Prof. Code, § 6060, subd. (h)) in certain circumstances. One of them is that the applicant, after graduation from an accredited law school and prior to the next final bar examination, shall have "entered upon active duty in the armed forces during a period of hostilities between the United States and any other nation." With the exception of this provision, it is undisputed that all of the requirements to allow Riave's admission to practice have been satisfied.

According to his petition, Riave presently is a major in the Air Force Reserve. After serving in the Army Air Force during the second world war, he was released to inactive duty. His education, interrupted by the war, was resumed, and, in June, 1950, he graduated from an accredited law school. The first final bar examination after that date was in October, 1950.

Prior to his graduation, Riave received orders to report on June 17, 1950, to an air force base for a 14-day tour of "active duty for training." On June 27th, three days before Riave's tour of duty terminated, hostilities commenced between the United States and North Korea. When he was released from this tour of duty, he was advised by his superior officers that he soon would be called for extended active duty. Although he participated in voluntary training and orientation classes immediately thereafter, he was not called to duty until March, 1951. Neither Riave nor the Bar Examiners rely upon these additional facts as being determinative of the present application. The narrow issue presented is whether his period of "active duty for training" amounts to entry upon "active duty in the armed forces during a period of hostilities" within the meaning of section 6060.8 of the Business and Professions Code.

Riave takes the position that "active duty in the armed forces" must be read as including training periods, since the section makes no express qualification concerning the type

of duty or length of tour. The Bar Examiners assert that the Legislature could not have intended to exempt from examination reservists in the armed forces who are called only for annual training duty.

The various federal statutes and regulations applicable to the calling of reserve officers to duty differentiate between "active duty" and "active duty for training." In the Armed Forces Reserve Act of 1952 (Act of July 9, 1952, ch. 608; 66 Stats. 481 et seq.; 50 U.S.C.A. 901 et seq.), active duty is defined as "full-time duty in the active military service of the United States, other than active duty for training." (50 U.S.C.A. 901[b].) The Servicemen's Indemnity Act of 1951 (Act of April 25, 1951, ch. 39; 65 Stats. 33; 38 U.S.C.A. 851) and the Act of June 20, 1949, relating to compensation for injuries in the line of duty (63 Stats. 202; 10 U.S.C.A. 456[2]), mention both active duty and active duty for training as being within the coverage of their provisions. On the other hand, Air Force Regulation 45-5, in effect in 1952, defines active duty as being synonymous with "active military service," the latter term being stated to include both "extended active duty" and "active duty for training."

Authority for calling to active duty a reserve officer has existed since 1920, with the enactment of the provisions which were carried into former section 369 of title 10 of the United States Code. (Act of June 4, 1920, ch. 227, subch. I, § 32; 41 Stats. 776.) By the terms of that section the President was authorized at any time to order such officer to active duty, with the limitation that he could not be required to serve without his consent in excess of 15 days during any calendar year, except in time of national emergency. Implementing this section were various executive orders and regulations of the military forces. (The provisions of former section 369 of title 10 now appear in subdivisions (b) and (c) of section 961 of title 50 of the U.S. Code.)

Air Force Regulation 35-76, together with regulations preceding it, established "a tour of active duty for training for the purpose of maintaining unit or individual proficiency." Such tours were limited in duration to 15 consecutive days, with no reservists being permitted to receive more than one short tour of active duty in any fiscal year. They are to be distinguished from "extended active duty," which is "[a]ny tour of active duty performed by an individual with the active establishment, and entered into with the original expectation of serving for an indefinite or stated period of time.

Tours under the provisions of AFR 35-76, regardless of duration, are not considered to be extended active duty.'' (Air Force Reg. 45-5.) It was common practice in the Air Force, as in other service branches, to arrange such short tours of duty approximately annually, within the limitations of departmental budget allowances. Riave's tour of duty was of this nature.

Section 6060.8 of the Business and Professions Code was enacted in 1951, after hostilities with North Korea had commenced. (Stats. 1951, ch. 1722, § 1.) It excused the requirement of a final bar examination (Bus. & Prof. Code § 6060, subd. (h)) for a veteran of World War II who graduated from an accredited law school after May 1, 1950, and following graduation and ''prior to the date of the next final bar examination, entered upon active duty in the armed forces during a period of hostilities between the United States and any other nation, or . . . during such hostilities, received orders to enter upon such active duty prior to the date of the next final bar examination, and thereafter actually enters upon such active duty within 15 days after the date of said final bar examination.''

■ It is a matter of common knowledge that, immediately after the commencement of hostilities in Korea, many veterans of World War II serving in reserve components, were recalled to active service in that conflict. ■ The apparent purpose of section 6060.8 was to benefit those veterans whose law study was interrupted by recall to military service. This purpose contemplates the call to extended periods of military service which the national emergency resulting from the Korean situation made necessary, rather than the annual 15-day periods of training duty.

Such short tours of duty neither resulted from, nor were affected by the Korean conflict. Continuously during the last 30 years they have been a part of our country's program for maintaining the efficiency of the armed forces. Training of members of the reserves was carried on during the Korean hostilities and is still authorized by law. Yet at no time in all these years has the Legislature, when exempting veterans from bar examinations, expressly mentioned the annual training duty of a reservist as a basis for such an exemption. Undoubtedly the reason for this is that such duty is limited to 15 days annually and, except during a time of national emergency, is the only type of full-time duty a reservist may be required to serve without his consent.

Under these circumstances it is not reasonable to infer that the Legislature intended to include this type of duty when in section 6060.8 of the code it used the expression "active duty in the armed forces during a period of hostilities."

The meaning of the term "active duty in the armed forces" is made clear in a recent enactment involving another field of veterans' benefits. Section 980 of the Military Veterans Code defines "veteran" for the purpose of aid and welfare benefits under division IV of that code. Formerly, the term was limited to those persons serving in the military or naval service during World War II. By amendment in 1953, the section was expanded to include "any person who served in the active military, naval or air service on or after June 27, 1950 and prior to a future date to be established by proclamation of the Governor. . . .

"Whenever the Governor, after June 27, 1950, finds that the United States is no longer engaged in any type of campaign involving persons in *active duty in the armed forces,* he shall issue a proclamation establishing the date after which persons entering *active duty in the armed forces* shall not be considered veterans for the purposes of this chapter.

"As used in this chapter 'veteran' does not include:

"(g) A person whose service with the armed forces was due to temporary active duty orders *for the sole purpose of training duty,* processing or a physical examination." (Emphasis added; Stats. 1953, c. 1334.)

The amendment was enacted as an emergency measure, with the facts constituting such emergency stated to be as follows:

"At the present time the law is not specific as to the required length of active service in the military forces to entitle one to the benefits of the California Veterans Farm and Home Purchase Act. It is necessary that the statute defining 'veteran' be clarified as soon as possible because at the present time persons who take short active duty training periods in the armed forces are demanding veterans' benefits under the Farm and Home Purchase Act and are claiming that they are eligible for such assistance. The statute was never intended to grant the benefits on the basis of such training."

Because of this conclusion, it is unnecessary to discuss other contentions of the State Bar.

The application is denied.

Traynor, J., did not participate.